**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DANYA DAVIS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | No. 11-cv-07923 |
| | ) | |
| v. | ) | Judge Andrea R. Wood |
| | ) | |
| PACKER ENGINEERING, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs Danya Davis, Shannon Webb, and Bernessa Wilson have sued Defendants

Packer Engineering, Inc. ("PEI") and The Packer Group, Inc. ("TPG") alleging that Defendants

unlawfully subjected them to a hostile work environment and retaliated against them for

complaining about such environment by terminating their positions, in violation of Title VII of

the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000 *et seq*. Plaintiffs Davis and Wilson

also assert claims under Title VII for gender discrimination and sexual harassment. Before the

Court are the parties' cross-motions for summary judgment. As explained below, Defendants'

motion for summary judgment (Dkt. No. 76) is granted in part and denied in part, and Plaintiffs'

motion for summary judgment (Dkt. No. 79) is denied.

## BACKGROUND

The following facts are gleaned from the parties' summary judgment filings.[1] As will be

readily apparent to any reader, many of the facts are disputed. For purposes of the pending

---

[1] These include the parties' submissions under Local Rule 56.1 (N.D. Ill.). Local Rule 56.1 "is designed, in part, to aid the district court, which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information, in determining whether a trial is necessary." *Delapaz v. Richardson,* 634 F.3d 895, 899 (7th Cir. 2011) (internal quotation marks and citation omitted). Local Rule 56.1(a) requires the moving party to provide "a

summary judgment motions, the Court considers the record in the light most favorable to the non-moving party, resolving all evidentiary conflicts in that party's favor and according that party the benefit of all reasonable inferences that may be drawn from the record. *See Coleman v. Donahoe,* 667 F.3d 835, 842 (7th Cir. 2012) (internal citation omitted).

Defendant PEI was an engineering consulting business and a wholly-owned subsidiary of Defendant TPG. (Pls. Resp. to Defs. Stmt. of Material Facts ("DSF") ¶¶ 4-5, Dkt. No. 91.) Both PEI and TPG had their principal places of business in Naperville, Illinois. (*Id.*) Plaintiff Davis, a woman, began working for PEI in or around October 2000. (*Id.* ¶ 7.) Davis held the positions of Director of Techno-Litigation, Senior Director of Techno-Litigation, Director of Project Management Service, and Vice President of Organizational Development. (*Id.* ¶ 8.) Plaintiff Wilson, also a woman, began working for PEI in or around May 2005 as an Administrative Assistant, and she maintained that role throughout her employment at PEI. (*Id.* ¶ 11.) Plaintiff Webb, a man, began working for PEI in August 2003 as an IT Coordinator, and then was promoted to the position of IT Director in or about 2005. (*Id.* ¶ 10.)

Plaintiffs allege that over the course of their respective employments, they were subjected to numerous incidents that demonstrate the existence of a culture of discrimination and harassment, as well as a hostile work environment, which culminated in their retaliatory terminations.

---

statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." *Petty v. City of Chicago,* 754 F.3d 416, 420 (7th Cir. 2014) (quoting N.D. Ill. L.R. 56.1(a)(3)). "The non-moving party must file a response to the moving party's statement, and, in the case of any disagreement, cite specific references to the affidavits, parts of the record, and other supporting materials relied upon." *Id.* (internal quotation marks and citation omitted); *see also* N.D. Ill. L.R. 56.1(b)(3)(A). Finally, Local Rule 56.1(b)(3)(C) "requires specifically that a litigant seeking to oppose a motion for summary judgment file a response that contains a separate statement…of any additional facts that require the denial of summary judgment." *Sojka v. Bovis Lend Lease, Inc.,* 686 F.3d 394, 398 (7th Cir. 2012) (internal quotation marks and citation omitted).

*Plaintiff Davis*

Davis alleges that she was subjected to repeated discrimination and harassment during her time at PEI. She claims that Defendants' employees frequently commented on her body, that various engineers gave her nicknames such as "Stripper Boobs" and "High Beams," and that male employees frequently made sexually explicit comments and crude jokes about female body parts. (Pls. Stmt. of Material Facts ("PSF") ¶¶ 12, 22, Dkt. No. 81.) Davis also claims that male employees frequently discussed pornography and how to obtain nude photos of female employees in front of her and others. (*Id.* ¶ 23.)

Davis alleges that PEI's President and Chief Technical Officer, Ed Caulfield, referred to female employees as "cunt" and "bitch," and that he claimed women were "lucky" to have jobs and should be paid less than men, since they should really be "barefoot and pregnant." (*Id.* ¶¶ 14-16.) Caulfield also commented at work that he was lucky to have sons, since with a son, he only had to worry about one penis, but if he had daughters, he would have had to worry about "five million penises." (*Id.* ¶ 17.) Davis claims that in December 2002, Caulfield pushed her head towards his groin and asked for a blow job. (*Id.* ¶ 18; DSF ¶ 12, Dkt. No. 78.) She also alleges that Caulfield once asked her to jump out of a cake for his birthday, and that on a separate occasion, Caulfield asked another employee if she would go on the show *The Amazing Race* with him and sleep with him every night. (PSF ¶ 18, Dkt. No. 81; Am. Compl. ¶¶ 38, 41, Dkt. No. 30.)

According to Davis, when she informed PEI executives about these issues, they repeatedly ignored her concerns and told her there was nothing they could do. In 2001, she had a meeting with Charlotte Sartain, PEI's Executive Vice President of Finance, where, during a discussion of the sexualization of the workplace, Sartain told Davis she needed to "be more than a sex symbol." (PSF ¶ 13, Dkt. No. 81.) Davis alleges that she reported the ongoing discrimination to Sartrain,

CEO Mike Koehler, and Chairman of the Board Kenneth Packer in January and March of 2009, and that Koehler told her to stop complaining and said he did not want to know about her allegations. (*Id.* ¶¶ 27-29.) Sartrain stated that she knew Caulfield was a male chauvinist and told Caulfield to "behave," but did not otherwise discipline him. (*Id.* ¶¶ 19-20.) Davis claims that Sartrain told her she was "living in a man's world" when Davis complained that employees were spreading rumors about her sexually pursuing other employees. (*Id.* ¶ 30.) She also asserts that, while PEI allowed her to prepare a presentation on sexual harassment in the spring of 2009 and to formulate new policies for PEI, several employees, including Caulfield, skipped the presentation and many of the male employees otherwise mocked it. (*Id.* ¶ 32.)

Davis further claims that after she reported her concerns about Caulfield, she was told by other employees that he was removing her from e-mail chains specifically related to her job responsibilities. (*Id.* ¶ 33.) Caulfield also began to openly disregard her in meetings, and would ignore her or talk over her. (*Id.* ¶ 34.) Davis states that in the summer of 2009, Caulfield suggested firing "all of the old and ugly women" to cut costs. (*Id.* ¶ 35.) She was informed that Caulfield wanted her salary decreased so that male employees could be paid more, and that Koehler agreed she was making too much money. (*Id.* ¶ 36.)

When cost-cutting measures were being proposed, and Davis suggested eliminating poorly-performing male employees, she claims she was told that they could not be terminated because they were men with families to support. (*Id.* ¶ 26.) Instead, Davis herself was terminated by PEI on October 5, 2009. (*Id.* ¶ 3.) Davis claims that after she was terminated, Koehler told her that "Caulfield won." (*Id.* ¶ 39.) Davis filed a charge with the U.S. Equal Employment Opportunity Commission ("EEOC") on January 25, 2010. (DSF ¶ 6, Dkt. No. 78.) As a result of financial conditions, Defendants ceased operations in January 2012, and all of Defendants' assets

were subsequently assigned to an assignee, Ronald Mrofka, for the benefit of their creditors. (*Id.* ¶¶ 26-27.)

Defendants, in response to Plaintiffs' statement of material facts, have denied all of Davis's allegations regarding examples of sexual harassment, gender discrimination, hostile work environment, and retaliation. (*See generally* Defs. Resp. to PSF, Dkt. No. 93.) Defendants further claim that while working at PEI, Davis had an affair with Senior Vice President Andrew Neuhalfen, and that other employees witnessed them having sex at the office. (Defs. Stmt. of Additional Facts ("DSAF") ¶¶ 1-2, Dkt. No. 93.) Davis admits to the affair with Neuhalfen but denies they had sex at the office. (Pls. Resp. to DSAF ¶¶ 1-2, Dkt. No. 97.)

Defendants contest that Davis was laid off for anything other than financial reasons. (DSAF ¶ 3, Dkt. No. 93.) And they admit that she was a "good employee." (Defs. Resp. to PSF ¶ 5, Dkt. No. 93.) Defendants claim that in 2009, PEI's revenue declined and there was a resulting cash shortage that required them to suspend all merit increases for employees, the 401k savings plan, and the incentive compensation plan. (DSF ¶¶ 17-19, Dkt. No. 78.) They state that in 2009, they suffered a loss in excess of $700,000. (*Id.* ¶ 23.) Defendants further claim that as a result of these financial conditions, they implemented a reduction in force on October 5, 2009, eliminating eleven positions, including those of Davis and Webb. (*Id.* ¶ 20.) They contend that the decisions about who to lay-off were made primarily by PEI's leadership group, consisting of Koehler, David Moore, Richard Kaczkowski, Nick Fioravante, Jim Sprague, and Tage Carlson, and that no one replaced Davis or Webb after their positions were eliminated. (*Id.*) Plaintiffs argue that Sartrain, Packer, Caulfield, and Mike Rogers were also involved in the decisions. (Pls. Resp. to DSF ¶ 20, Dkt. No. 91.) Defendants claim that the layoff decisions were based primarily on who did not bill their time, with the exception of two employees who were terminated due to lack of

productivity and lack of work. (DSF ¶ 21, Dkt. No. 78.) Defendants further note that Davis applied for unemployment after she was laid off and represented that the reason for her separation was "lack of work." (DSAF ¶ 6, Dkt. No. 93.)

### *Plaintiff Wilson*

Wilson claims that she was exposed to vulgarity and offensive discussions about female employees on a daily basis while she worked at PEI. (PSF ¶ 40, Dkt. No. 81.) She alleges that male employees gawked at female employees and made "boom, boom, boom, boom" noises as they walked by, along with sexually offensive comments and jokes. (*Id.* ¶¶ 40-41.) Wilson was aware that male employees referred to Davis as "High Beams" and to Davis's mother-in-law as "Old High Beams." (*Id.* ¶ 41.) She alleges that engineer Aaron Jones once hung a rubber chicken from his door and explained to Wilson that it was there because "sometimes you have to choke the chicken," while groping his crotch in her direction. (*Id.* ¶ 42.)

Wilson states that she sat directly in front of the office of John McKinney, PEI's Director of Systems Failure Analysis and Senior Director of Industrial and Process Safety, and that McKinney was one of the engineers who assigned work to her. (*Id.* ¶¶ 43-44.) Both the wall of McKinney's office and the door had glass inserts. (*Id.* ¶ 45.) Wilson claims that on a daily basis she observed and heard McKinney watching pornography on his office computer and that she and other female employees (such as Getina George and Jackie Waters, two other Administrative Assistants) saw him masturbating while he was watching pornography in his office. (*Id.* ¶¶ 46, 49.) Wilson states that she could see and hear everything when McKinney's door was closed due to the glass inserts, but McKinney also watched pornography and masturbated in his office with the door open. (*Id.* ¶¶ 45, 49.) Wilson claims that Defendants' Vice President, David Moore, who had an office adjacent to McKinney's, acknowledged that he could also hear McKinney, and that

it was happening "too much," but that Moore did nothing to address the situation. (Am. Compl. ¶ 86, Dkt. No. 30.) In the spring of 2009, Wilson confronted McKinney but was unable to get him to acknowledge or change his behavior. (*Id.*) According to Wilson, she also complained to Davis after the sexual harassment seminar, but Davis was unable to convince PEI management to take action. (PSF ¶¶ 31, 57, Dkt. No. 81.)

Consequently, Wilson filed a formal charge of discrimination with the EEOC on December 22, 2009; Defendants received notice of that charge in January 2010. (*Id.* ¶¶ 58, 60.) Wilson claims that after she filed her charge, PEI searched McKinney's laptop and found pornography. (*Id.* ¶ 52.) He was not fired; instead, his office was moved down the hall, away from Wilson's desk, because PEI believed in giving employees second chances. (*Id*. ¶¶ 52-53.) Wilson claims that PEI did not confirm that McKinney was masturbating, instead taking the position that he may have been rubbing his lap due to a medical necessity. (*Id.* ¶ 53.)

Wilson claims that in October 2009, she was offered a promotion to become PEI's Marketing Manager, but PEI rescinded the promotion offer on February 17, 2010 because of the EEOC charge she had filed. (*Id.* ¶¶ 59-61.) As a result, Wilson filed a second EEOC charge on February 19, 2010, alleging improper retaliation. (*Id.* ¶ 62.) Wilson claims that after filing this second charge, she was unlawfully terminated on September 16, 2010 in retaliation. (*Id*. ¶ 63.)

As with Davis, Defendants have denied all of Wilson's allegations regarding examples of sexual harassment, gender discrimination, hostile work environment, and retaliation. (*See generally* Defs. Resp. to PSF, Dkt. No. 93.) They claim that although Wilson was not part of the initial reduction in force in October 2009, as a result of continuing revenue declines and cash shortages, PEI determined in September 2010 that a second round of layoffs was necessary. (DSF ¶ 24, Dkt. No. 78.) Defendants assert that Wilson was included in the second round of layoffs

because she did not bill her time, PEI was low on work, and Wilson had "performance issues." (*Id.* ¶ 25.) In response to Plaintiffs' statement of material facts, however, Defendants admit that Wilson was a "good employee." (Defs. Resp. to PSF ¶ 8, Dkt. No. 93.)

### *Plaintiff Webb*

Webb alleges that during the course of his employment, he was forced to endure the offensive comments of his male co-workers on a regular basis. He claims that Caulfield sent him sexually explicit and offensive materials and that Caulfield also included Webb in conversations about the sexual activities of other employees, such as describing how a female employee, Kim Stratman, wanted to "grudge-fuck" her ex-husband. (PSF ¶¶ 64-65, Dkt. No. 81.) Webb claims he was ridiculed when he refused to participate in conversations about sexual fetishes with employees like Tim Kuhn. (*Id.* ¶¶ 66, 71.) When Webb complained about his co-workers' comments or refused to engage in their discussions, he was called a "chicken little" and a "whiner" by other male employees and was told he was being a "poor Marine." (*Id.* ¶ 74.) Webb also claims that as part of his job responsibilities, he had to work on computers used by McKinney, Jones, and others, and that as a result, he was often shown sexually explicit, offensive, and pornographic pictures, videos, and other materials. (*Id.* ¶¶ 67-68.)

Webb states that he complained repeatedly to PEI management, including Moore, Sartrain, and Packer. Packer told Webb that Defendants did not have an HR Department and that employees were supposed to act as their own HR Department. (*Id.* ¶ 69.) Webb states that when he complained to Caulfield about inappropriate e-mails, Caulfield responded, "Get the fuck out of here. Who are you? I'm the president." (*Id.*) Webb claims that after he complained about these issues and despite his positive performance reviews, Defendants reduced his salary while keeping other IT professionals at the same pay levels, and denied him raises and bonuses while providing

those same rewards to other employees. (*Id.* ¶ 75.) Webb states that he was forced to work back-to-back shifts in Illinois, then Michigan, and then back in Illinois—requiring him to drive long distances over a short period of time. (*Id.* ¶ 76.) Webb was then terminated on October 5, 2009. (*Id.* ¶¶ 9, 77.) He claims that after he was terminated, Packer admitted to him, "What we did was wrong. That wasn't right." (*Id.* ¶ 78.) Webb filed an EEOC charge on February 16, 2010. (DSF ¶ 6, Dkt. No. 78.)

As with his female co-plaintiffs, Defendants have denied all of Webb's allegations regarding examples of hostile work environment and retaliation. (*See generally* Defs. Resp. to PSF, Dkt. No. 93.) Defendants also claim that Webb was included in the October 2009 layoffs because of PEI's poor financial condition and his failure to bill his time, and that no one replaced him after he was terminated. (DSF ¶¶ 20-21, Dkt. No. 78.) Defendants also admit that Webb was a "good employee." (Defs. Resp. to PSF ¶ 11, Dkt. No. 93.) Defendants further note that Webb applied for unemployment after he was laid off and represented that the reason for his separation was "lack of work." (DSAF ¶ 7, Dkt. No. 93.)

## DISCUSSION

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When presented with a summary judgment motion, "[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994)). "In evaluating whether a genuine issue of material fact exists, all evidence and inferences must be viewed in the light most favorable to the nonmoving party." *Scott v. Edinburg*, 346 F.3d 752, 755 (7th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 255 (1986) and *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003)). "[A] court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence; it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (citing *Anderson*, 477 U.S. at 255).

## I.    Defendants' Motion for Summary Judgment

Defendants argue they are entitled to summary judgment for three reasons: (1) a number of Plaintiffs' claims are time-barred; (2) Plaintiffs cannot establish unlawful retaliation; and (3) TPG was not the Plaintiffs' employer and therefore is not a proper Defendant. The Court addresses each of these arguments in turn below.

### A.    Statute of Limitations for Plaintiffs' Claims

Under 42 U.S.C. § 2000e-5(e)(1), an individual must file an EEOC charge within 180 days of the unlawful employment practice.[2] "Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire" must occur within the 180-day timeframe. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002). Hostile work environment claims, on the other hand, can survive even if some of the components of those claims fall outside of the 180-day window. As the Supreme Court has explained:

---

[2] 42 U.S.C. § 2000e-5(e)(1) states as follows: "A charge…shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred…except that in a case…with respect to which the person aggrieved has initially instituted proceedings with a State or local agency[,] such charge shall be filed…within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings[,] whichever is earlier[.]" It is not entirely clear from the filings that the parties are in agreement that the 180-day timeframe applies here. Nevertheless, Plaintiffs admit that their charges were filed with the EEOC and do not reference any state or local proceedings. Thus, the Court proceeds under the assumption that 180 days is the applicable time period.

> The timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

*Morgan*, 536 U.S. at 117; *see Turner v. The Saloon, Ltd.*, 595 F.3d 679, 685 (7th Cir. 2010) ("Under *Morgan*, then, the district court should have asked whether *any* of Lake's alleged acts of sexual harassment occurred within the statutory time period…the court should have analyzed whether all of Lake's conduct, taken as a whole, created an actionable hostile work environment.") (emphasis in original).

Defendants argue that any allegations by Plaintiffs that predate the 180-day timeframe before their respective charges were filed are time-barred. As provided in *Morgan*, the Court must determine whether any of the discrete acts at issue occurred before the 180-day timeframe. Davis was terminated on October 5, 2009 and filed her charge on January 25, 2010, well within the timeframe. Wilson filed her first charge with the EEOC on December 22, 2009, claims she was denied a promotion on February 17, 2010, and filed her second charge two days later on February 19, 2010. She was then terminated on September 16, 2010. Webb was terminated on October 5, 2009 and filed his charge on February 16, 2010, also well within the timeframe.

Webb, however, does further allege in the amended complaint that he was subject to other discrete acts prior to the 180-day timeframe, such as a salary reduction in 2006 or 2007, a salary freeze starting in 2008, and denial of raises and bonuses starting in 2007. (Am. Compl. ¶ 70, Dkt. No. 30.) Those discrete acts, outside of the 180-day window, are not actionable. "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Morgan*, 536 U.S. at 113. Webb may, however, still use these discrete acts "as background evidence in support of a timely claim." *Id.* Thus, Defendants' motion for

summary judgment as to the discrete acts alleged by Webb outside of the 180-day timeframe—namely, the failure to award a raise or bonus and salary amount determinations—is granted. But Webb may still use those earlier acts as background evidence to support his hostile work environment claims and his retaliation claims for improper termination.

### B.      Retaliation Claims

Under Title VII, an employer is generally prohibited from retaliating against an employee for conduct that is protected under the statute. 42 U.S.C. § 2000e-3(a). Plaintiffs may support their retaliation claims using either the direct method of proof or the indirect method of proof. Under the direct method, Plaintiffs must "present evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Turner*, 595 F.3d at 687 (quoting *Amrhein v. Health Care Serv. Corp.*, 546 F.3d 854, 858 (7th Cir. 2008)). "In order to prove causation, 'the plaintiff must demonstrate that the employer would not have taken the adverse action but for the protected expression.'" *Cullom v. Brown*, 209 F.3d 1035, 1040 (7th Cir. 2000) (quoting *Johnson v. Univ. of Wis.-Eau Claire*, 70 F.3d 469, 479 (7th Cir. 1995)). Direct evidence can be either an admission by the employer or "a mosaic of circumstantial evidence that directly points to a discriminatory intent." *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 786 (7th Cir. 2004) (internal quotations and citations omitted).

Under the indirect method, Plaintiffs must prove that they "(1) engaged in a statutorily protected activity; (2) met [their] employer's legitimate expectations; (3) suffered an adverse employment action; and (4) w[ere] treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *Turner*, 595 F.3d at 688 (quoting *Amrhein*, 546 F.3d at 859). The Seventh Circuit has recognized that the distinction between the direct and indirect methods is "often fleeting" since "both methods allow the use of circumstantial

evidence." *Martino v. MCI Commc'ns Servs., Inc.*, 574 F.3d 447, 452 (7th Cir. 2009) (internal citation omitted).

Under the indirect method, once Plaintiffs meet their burden, the burden of production then shifts to Defendants to provide a legitimate, non-discriminatory reason for the retaliatory action. *See Davis*, 368 F.3d at 788. If Defendants manage to do so, then Plaintiffs must rebut the stated reason for the retaliatory action with evidence that the reason was simply pretext for discriminatory conduct. *See id.* Plaintiffs can demonstrate pretext by showing that the stated reason "(1) had no basis in fact; (2) did not actually motivate [the] discharge; or (3) was insufficient to motivate [the] discharge." *Id.* at 784 (internal citation omitted).

In this case, Plaintiffs have satisfied the first two prongs outlined in the direct method. They have each put forward evidence that they engaged in a statutorily protected activity (namely, complaining about discrimination, harassment, and a hostile work environment) and that they were subjected to a materially adverse action by their employer (namely, the termination of all three Plaintiffs and the denial of a promotion for Wilson). What remains to be decided is whether Plaintiffs have presented sufficient evidence from which a jury could conclude that there was a causal connection between the protected activities and the materially adverse actions.

Defendants argue that Plaintiffs were terminated for financial reasons that had nothing to do with their allegations of discrimination, harassment, or a hostile work environment. Defendants further argue that the only reason Wilson did not receive a promotion is the financial issues that were plaguing PEI starting in 2009.[3] Plaintiffs claim that although there were financial issues in

---

[3] Defendants also argue in their reply brief that Wilson has no proof that she was approved for a promotion. But Defendants' Rule 30(b)(6) deponent admitted that Wilson was approved for a promotion. (*Compare* Defs. Reply in Support of Mot. for Summ. J. at 13 ("As for Plaintiff Wilson, Plaintiffs have failed to establish that she had any 'promised promotion.'"), Dkt. No. 99 *with* Defs. Resp. to PSF and

2009, which ultimately resulted in PEI closing in 2012, those issues were not the true reason Plaintiffs were terminated. Rather, Plaintiffs claim that Defendants used cost-cutting as a pretext to terminate them despite the fact that they were performing well. To support this version of events, Davis claims that when cost-cutting measures were originally proposed in 2009, Caulfield suggested firing "all the old and ugly women." (PSF ¶ 35, Dkt No. 81.) She further claims that when she made suggestions for terminating certain low-performing male employees, she was told they would not be terminated because they had families to support. (*Id.* ¶ 26.) She also claims that Caulfield and Koehler agreed that she was making too much money, and that Caulfield wanted her salary decreased to pay male employees more money. (*Id.* ¶ 36.) And after Davis was terminated, Koehler told her that "Caulfield won." (*Id.* ¶ 39.)

Wilson asserts that Defendants found out about her EEOC charge in January 2010 and then withdrew her promised promotion on February 17, 2010. She claims that during the time period leading up to when she filed her EEOC charge, she complained numerous times about McKinney's conduct, and that her complaints were repeatedly ignored. Specifically, she claims that she discussed McKinney's actions numerous times with her supervisor, Moore, who took no remedial action, and that she also brought the issue to the attention of Davis, who was unable to persuade senior management to do anything about it. (*Id.* ¶¶ 55, 57.)

Based on the record before it, the Court does not disagree that PEI was facing financial pressure in 2009. Davis refers to cost-cutting measures at that time and notes that she was initially involved in discussions about potential employee layoffs. The question, however, is whether those financial concerns motivated the termination of Davis and Webb, the denial of Wilson's promotion, and Wilson's termination. *See Perez v. Thorntons, Inc.*, 731 F.3d 699, 708 (7th Cir.

---

DSAF, Ex. B at 58 ("Yes, sir. She was approved for that position, but then due to the lack of revenue and cash, we could not promote her to that position, and we explained that to her at the time."), Dkt. No. 93.)

2013) ("[i]f the stated reason, even if actually present to the mind of the employer, wasn't what induced him to take the challenged employment action, it was a pretext") (quoting *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 418 (7th Cir. 2006)). Given the evidence presented by Plaintiffs regarding statements made post-termination and the unwillingness of PEI management to address harassment and discrimination concerns, it is entirely plausible that Plaintiffs faced repercussions they would not otherwise have faced because of their protected activity, regardless of Defendants' financial condition. To resolve the pretext question thus requires credibility determinations—*e.g.*, whether one believes that Koehler told Davis that "Caulfield won," whether one believes that Packer told Webb, "What we did was wrong. That wasn't right," and whether one thinks that Defendants no longer saw value in Wilson as an employee after she took her complaints to the EEOC. Defendants argue that Packer's supposed statement to Webb is too vague to support liability, but the statement is not so vague as to preclude the conclusion that it referenced improperly terminating Webb for his protected activity. "[T]he task of disambiguating ambiguous utterances is for trial, not for summary judgment." *Phelan v. Cook County*, 463 F.3d 773, 782 (7th Cir. 2006) (quoting *Shager v. Upjohn Co.*, 913 F.2d 398, 402 (7th Cir. 1990)). The resolution of these credibility issues, and others, is not appropriate at the summary judgment stage, and summary judgment is therefore denied as to Plaintiffs' retaliation claims.

### C. TPG as a Defendant

Title VII provides a remedy only for actions by employers. "[A] corporation may be liable for its affiliate's discriminatory acts if (1) the traditional conditions for 'piercing the corporate veil' are present; or (2) the corporation took actions, *e.g.*, split itself into a number of smaller corporations, for the express purpose of avoiding liability under the discrimination laws; or (3) the corporation directed the discriminatory act, practice, or policy of which the employee is

complaining." *Coleman v. ANR-Advance*, 34 Fed. Appx. 223, 225 (7th Cir. 2002) (citing *Worth v. Tyer*, 276 F.3d 249, 259-60 (7th Cir. 2001) and *Papa v. Katy Indus., Inc.*, 166 F.3d 937, 940-41 (7th Cir. 1999)).

Defendants argue that TPG cannot be held liable for the claimed violations of Title VII because TPG was not Plaintiffs' employer. Instead, according to Defendants, PEI was Plaintiffs' employer, and TPG was merely the holding company for PEI and other organizations. In response, Plaintiffs agree that PEI was wholly-owned by TPG but go on to argue that TPG and PEI were highly integrated in that they "shared the same offices, the same business, and the same leadership." (Pls. Resp. to Defs. Mot. for Summ. J. at 13, Dkt. No. 90.) At her deposition, Sartrain testified that she was employed by TPG, and that she was originally hired by Packer. (Defs. Resp. to PSF and DSAF, Ex. B at 8, Dkt. No. 93.) She explained that the Chief Executive Operating Council of TPG consisted of herself, Packer, and Warren Denniston. (*Id.* at 17.) She further explained that TPG was the holding company of PEI, and that "[i]t held the income taxes, the corporate taxes, kind of the umbrella over Packer Engineering. Packer Engineering had the employees, the revenues, and we, the three of us, CEO, kind of were over that—the umbrella, I guess, we could call it." (*Id.* at 19.)

Although it appears that the directors of PEI and TPG overlapped to some degree, that fact does not warrant piercing the corporate veil. To the contrary, "it is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts." *United States v. Bestfoods*, 524 U.S. 51, 69 (1998) (quoting *American Protein Corp. v. AB Volvo*, 844 F.2d 56, 57 (2d Cir. 1988)). "Since courts generally presume that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary…it cannot be enough to establish

liability…that dual officers and directors made policy decisions and supervised activities at the facility." *Id.* at 69-70 (internal quotations and citations omitted). Instead, to pierce the corporate veil, Plaintiffs must show that "despite the general presumption to the contrary, the officers and directors were acting in their capacities as [TPG] officers and directors, and not as [PEI] officers and directors, when they committed those acts." *Id.* at 70. Plaintiffs have made no such showing here beyond conclusory statements about the overlap in leadership and office space. Defendants' motion for summary judgment as to the claims against TPG is therefore granted.

## II. Plaintiffs' Motion for Summary Judgment

Plaintiffs argue that they are entitled to summary judgment as to all of their claims because they have clearly met the standards for gender discrimination, sexual harassment, hostile work environment, and retaliation claims. The Court analyzes each of these claims in turn below.

### A. Discrimination Claims

Title VII prohibits an employer from, among other things, "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's…sex[.]" 42 U.S.C. § 2000e-2(a)(1). To establish a discrimination claim, each Plaintiff must show: (1) that he or she was a member of a protected class; (2) that he or she was meeting Defendants' legitimate job expectations; (3) that he or she was subjected to a materially adverse employment action; and (4) that others outside the protected class were more favorably treated. *See Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008). If Plaintiffs can make that *prima facie* showing, Defendants "would then have to articulate a legitimate, nondiscriminatory explanation for the employment action which [Plaintiffs], finally, would have the opportunity to prove to be pretextual." *Id.* (internal citations omitted).

Plaintiffs Davis and Wilson raise discrimination claims here. They have presented evidence that they were members of a protected class (*i.e.*, women) and that they were meeting Defendants' legitimate job expectations, as Defendants agree that both Plaintiffs were "good employee[s]." (Defs. Resp. to PSF ¶¶ 5 (Davis), 8 (Wilson), Dkt. No. 93.) Plaintiffs have also shown that they were subjected to materially adverse employment actions; both were terminated, and Wilson was also denied a promotion before she was terminated. There is a genuine issue of material fact as to whether others outside the protected class were more favorably treated, which depends on whether Plaintiffs can convince a jury that male employees were treated more favorably than female employees at this time, even though the layoffs at issue included male employees. Plaintiffs allege that there were poorly-performing male employees who could have been terminated instead of them, but that they were chosen for layoffs because they are women and had complained about discrimination and harassment.

The final part of the analysis under the indirect method's burden-shifting paradigm is to determine whether Defendants can demonstrate a legitimate, non-discriminatory reason for the employment actions and whether Plaintiffs can show such reason was pretextual. As discussed previously, Defendants claim that the actual reason for all Plaintiffs' terminations and the denial of Wilson's promotion was a financial setback that necessitated cost-saving measures. Plaintiffs, in turn, argue that financial issues did not motivate the adverse employment actions, as evidenced by the statements and conduct of male employees and supervisors at PEI. For the same reason the Court concludes that the retaliation claims raise genuine issues of material fact, including credibility determinations that are inappropriate at the summary judgment stage, so too do Plaintiffs' discrimination claims. Summary judgment is therefore denied.

## B.      Hostile Work Environment/Harassment Claims

All three Plaintiffs raise hostile work environment claims. To establish a hostile work environment claim, Plaintiffs must show that: "(1) [they] w[ere] subjected to unwelcome sexual conduct, advances, or requests; (2) because of [their] sex; (3) the acts were severe or pervasive enough to create a hostile work environment; and (4) there is a basis for employer liability." *Turner*, 595 F.3d at 684 (internal citation omitted).

Defendants contest virtually all of the evidence upon which Plaintiffs rely for their summary judgment motion, denying that the alleged discriminatory conduct took place. In addition to their blanket denials in response to Plaintiffs' statement of material facts, Defendants' Rule 30(b)(6) deponent, Sartrain, testified that from 2006 to 2010, no one complained to PEI that Davis was experiencing sexual harassment or gender discrimination. (Defs. Resp. to PSF and DSAF, Ex. B at 24, Dkt. No. 93.) Sartrain also testified that Webb never complained that women were experiencing sexual harassment or gender discrimination during that time period and that no one reported that Wilson was experiencing sexual harassment or gender discrimination during that time period. (*Id.*) Sartrain claims that the first time PEI learned that Davis, Webb, and Wilson were alleging Title VII violations was when each filed his or her respective EEOC charge. (*Id.* at 25.)

There are a few instances in which Defendants' denials appear to be inconsistent with other testimony given during the course of Sartrain's deposition, however. For example, Sartrain stated that she personally observed Jones humping a door and reported it to Caulfield, after which she never heard another complaint about Jones or saw him doing anything improper. (*Id.* at 35.) Sartrain also testified that PEI was aware that Caulfield referred to female employees as "cunts" and "bitches," but the timeframe when PEI was aware of those comments is unclear from the

deposition transcript. (*Id.* at 34.) Sartrain also acknowledged that a female employee, Diane

Hoffman, brought it to PEI's attention that Caulfield had told her he would audition for the show

*The Amazing Race* only if he could sleep with her every night; but Sartrain also claims that

Hoffman said not to do anything about it as she would handle it herself. (*Id.* at 37.) In addition,

Caulfield admitted in his deposition that he told others at PEI that he was glad he only had sons

since with three boys he only had "three penises" to worry about instead of "5 million penises,"

and Sartrain acknowledged that Caulfield made a comment along those lines to her as well. (*Id.*,

Ex. B at 38, Ex. C at 19-20.)

Sartrain also acknowledged that after Wilson filed her first EEOC charge, PEI investigated

the allegations about McKinney and found that he had been "viewing some pornography" but did

not find that he had been masturbating. (*Id.*, Ex. B at 47-49.) She stated that they moved his desk

away from Wilson's and told him that he was never to view pornography again and had to keep

his door open, and that they did not terminate him because they were a "small company" that

"would give many people chances." (*Id.* at 47-48.)

The parties contest almost all of the material facts at issue. They contest whether the

comments Davis says were made to her were ever made at all and whether she actually took her

complaints to PEI management while she was employed at PEI. They contest whether the

statements Webb claims were made to him were actually made and whether PEI was aware of any

improper conduct towards Webb prior to his termination. These are genuine issues of material fact

that cannot be resolved on summary judgment but rather are appropriately reserved for a jury.

With respect to Wilson's claims, there does not appear to be any real dispute as to whether

she was subjected to unwelcome sexual conduct that was severe or pervasive enough to create a

hostile work environment. Wilson was not the only witness to McKinney viewing pornography in

his office. That act was also witnessed by Jackie Waters, another Administrative Assistant, and Moore, Wilson's supervisor. (PSF, Ex. 4 at 12 (Sartrain confirming Waters was a witness), Ex. 6 at 13 (interview of Moore acknowledging he heard "heavy breathing, moaning, f-word and it sounded like a female voice" from McKinney's office, and noting Wilson had informed him that she saw McKinney masturbating), Dkt. No. 81.) Wilson claims that after Moore refused to act, she approached McKinney herself and asked him to stop, and that the only response he would give to her complaints was "Ok" until she left his office. (Pls. Stmt. of Additional Facts, Ex. A at 3-4, Dkt. No. 92.) Sartrain testified that PEI's investigation concluded that McKinney was watching pornography but not masturbating. She also claims that PEI took immediate remedial action, after which there were no issues, a fact that Plaintiffs dispute. Wilson is still not entitled to summary judgment on her hostile work environment claim, however, because she has failed to show that there is no genuine dispute over whether the unwelcome sexual conduct was because of her sex. Unlike in *Orton-Bell v. Indiana*, 759 F.3d 768, 774-75 (7th Cir. 2014), where the plaintiff presented no evidence that other employees were having sex on her desk, or that supervisors refused to intervene, *because* she was a woman, here this is an issue that could reasonably be decided either way depending on who the jury believes and how the jurors view the evidence. As such, the motion for summary judgment on these claims is denied.

## C. Retaliation Claims

As explained in the above discussion of Defendants' summary judgment motion, the record shows that Plaintiffs' retaliation claims raise genuine issues of material fact to be decided by a jury. Therefore, like Defendants' motion, Plaintiffs' summary judgment motion on those claims also must be denied.

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment (Dkt. No. 76) is granted in part and denied in part. The motion is granted with respect to Webb's claims based on PEI's alleged refusal to pay bonuses or provide raises prior to August 16, 2009. Webb may still use evidence relating to those allegations to support his remaining, actionable claims. Defendants' motion is also granted as to the claims against Defendant TPG, which was not Plaintiffs' employer and therefore cannot be held liable under Title VII. Defendants' motion is otherwise denied. Plaintiffs' motion for summary judgment (Dkt. No. 79) is denied in its entirety.

ENTERED:

Dated:  March 31, 2016

_____
Andrea R. Wood
United States District Judge